Case of the morning is International Construction Products, LLC v. Ring Power Corporation, Ziegler, Inc., Thompson Tractor Company, Inc., No. 22-10231. Mr. Shanmugam, you have reserved three minutes for rebuttal. You may proceed. Thank you, Judge Branch. Ken and Shanmugam of Paul Weiss for International Construction Products, or ICP. May it please the Court, the District Court in this case held that ICP failed to present sufficient evidence from which a jury could find that defendants were part of a conspiracy to limit competition by blocking ICP from selling new heavy construction products to North America. The District Court in Delaware subsequently held that there was sufficient evidence. The defendants pressured Iron Planet to end its relationship with ICP and intended to exclude the possibility that they acted independently. The District Court below was wrong, and the Delaware District Court was right. The Delaware Court let in some hearsay evidence that the District Court here excluded, right? Yes, that is correct, which is to say that the District Court in Delaware, in our view, correctly concluded that the exception for testimony from a co-conspirator applied. And so the District Court in Delaware, therefore, did look at different evidence. But again, our submission is that the District Court here erred in that respect. It also erred in other respects, in our view, by applying an excessively stringent standard at summary judgment. But could I, I want to return to the hearsay, could Iron Planet really be a co-conspirator in a scheme against itself? Well, ultimately, it was a scheme against ICP. And so our submission with regard to Iron Planet, and this is consistent, Judge Grant, with the allegations in the complaint, even though Iron Planet was not named as a defendant, is that Iron Planet acquiesced in the threats and terminated ICP in response to those. But does that make them a co-conspirator, or just, even in the, let's take the best light, right? Let's assume that there was a conspiracy. Does that make them a co-conspirator or a victim of an antitrust conspiracy? I think in our view, acquiescence does make them a co-conspirator, and we cite cases to that effect in our brief. Now, this, of course, relates only to certain aspects of the testimony concerning what Jeter said to Frank. And so just to be clear, what we're talking about here, we're talking about Frank's testimony concerning some of the conversations with Jeter. There is also evidence from a deposition and from an email from Jeter to the same effect, and all of that is consistent. Namely, it is evidence that Iron Planet terminated ICP in response to pressure, and pressure from multiple parties, from Caterpillar and at least one other manufacturer, from manufacturers and dealers, and so forth. Now, what about the submission with regard to the district court here is that the reason that the district court, in our view, reached the wrong conclusion was not just because of the exclusion of the hearsay evidence, Judge Grant, it was also because the district court, in our view, held ICP to an erroneously elevated burden and also erroneously refused to consider evidence pertaining to the merger negotiations on the basis that the district court in Delaware had excluded that evidence, whereas, in fact, it is now clear that the district court in Delaware did not do so. Now, I want to sort of walk through those errors in my limited time because I think at a minimum, those errors suggest that this court should send the case back for the district court to reconsider, if not reverse the district court's grant of summary judgment outright. Now, with regard to this issue of the elevated burden, what the district court suggested was that ICP was required to show a particular defendant's involvement in the conspiracy unambiguously, and it further discounted evidence that required one or more inferences. Now, let me explain why I think that that is incorrect. To be sure, courts draw distinctions between direct evidence and circumstantial evidence, but that's not really the point here because we know that the Supreme Court has indicated in Matsushita and elsewhere that circumstantial evidence can be sufficient. Instead, where I think the district court really went wrong here is that the district court seemed to require either that we have smoking gun evidence of the conspiracy, I think that's what the district court meant when it was talking about direct evidence, or evidence that the defendants engaged in parallel conduct, which has to be accompanied by plus factors. In fact, what we really have here is both. This is really in the nature of a hybrid case, because on the one hand, you have the parallel conduct, and while there's a back and forth between ICP and the defendants about how parallel the conduct has to be, I think it's pretty clear from the case law that where the defendants share the same ends, they don't have to use the same means. But this is not just— Wait, wait one second. They don't have to get together to decide something, to be in collusion with one another? Well, they do very much have to get together, Judge Schlesinger, which is— What is the evidence of the get together, rather than there was just parallel conduct? Well, just to be clear, parallel conduct could be sufficient if it is accompanied by plus factors. And we think that that is, in fact, that would, in fact, be the case here, even if we did not have more. But the more here, Judge Schlesinger, is that we do have evidence of a conspiracy. And we will see that evidence, particularly in our reply brief, starting at page two. I will point to just sort of one example, which is the flurry of phone calls from Rand and Fowler to essentially almost all of the relevant interested parties immediately before Iron Planet took ICP off the website. Now, to be sure, if you were labeling that evidence, you would say that that's circumstantial evidence and not direct evidence of a conspiracy. But as Judge Andrews found in the district court decision in the Delaware case, that is pretty damning circumstantial evidence because of the timing of the calls and the identity of the people to whom the calls were placed. And while defendants attempt to explain away a small subset of those calls on the theory that Ring Power was communicating with one of the other defendants, Thompson, concerning the sale of a piece of used equipment, that obviously doesn't explain the entirety of those calls. Now, we rely on a flurry of other evidence. But why do we, I mean, that's evidence I think that the Delaware court didn't have. Why do we assume that other things were discussed in those calls when those companies have provided what they say is the content of the calls, which I think is different perhaps than a straight denial, right? Well, I think it is true, Judge Grant, that the evidence concerning the potential sale of a piece of used equipment was not before the district court in the Delaware case. But I think I would make two points in response to that. The first is that obviously there were other communications, and in particular communications with, among others, Iron Planet directly, with Caterpillar, and not just anyone at Caterpillar, but Richard Longbottom, who was Caterpillar's liaison to Cat Auction and therefore was centrally involved in the merger discussions. And so that evidence obviously is common to both cases. But second, I think what I would say is that, you know, the one thing that the Supreme Court has made clear in this context is that, you know, the ordinary rule still applies, even in antitrust cases at the summary judgment stage, that the jury is entitled to draw reasonable inferences from the evidence. Indeed, that's a principle that this court reaffirmed in the helicopter support systems case, which I think is probably the closest, most relevant precedent from this court in this area. And so I think that this is sort of the classic example of a situation in which the jury could draw inferences that those calls were made in furtherance of the conspiracy. When you say those calls, can you be very specific about which calls you're talking about? So I'm talking about the numerous phone calls that Richard Fowler made on the 2nd of April, including calls to Greg Owens at Iron Planet, Richard Longbottom at Caterpillar, and then subsequent calls to Longbottom and Owens, you know, just hours before ICP was removed from the Iron Planet website. Now, to be sure, I don't want to leave the court with the impression that all we have is inferences from those phone calls, because, of course, we have a whole series of email communications, both between people within Caterpillar, people at Caterpillar to others, and, of course, the whole series of email communications, both from Bill Heft, who was not only the chairman of Cat Auction, but also, obviously, the chairman of Ziegler, and, of course, the separate evidence concerning Thompson and Thompson's demand that absent a statement that Iron Planet was terminating ICP, its deal with Iron Planet would be in a holding pattern. And I think perhaps the most damning fact about all of this is that ICP actually provided that written confirmation to Thompson before Iron Planet communicated to ICP that it was, in fact, terminating the contractual arrangement. And so you have all of these categories of evidence separate and apart from a bare allegation of parallel conduct. But you've got – so you've got emails that definitely show that there was concern over the deal with ICP. But I guess what I'm looking at is how are you linking this to show the concerted action? And that's what we've been – I think the phone calls are what you're pointing to, but what other evidence are you pointing to that shows the concerted action, not just that individual companies were concerned? Sure. So let me provide one other example, Judge Branch, of that. As the Court will be aware, there was a lot of internal communication at Caterpillar as soon as it learned about the fact that ICP would be selling new equipment on the Iron Planet website. For instance, on March the 14th, there was an email from Richard Longbottom, who, again, was not just a Caterpillar. He was the liaison to Cat Auction, where he said, quote, what if we could ensure that On the same day, the CEO of Cat Auction, Gary Trettle, emails Bill Hoft and says, Caterpillar, quote, has indicated this would kill the deal. And shortly thereafter, Kent Adams, one of two Kent Adamses in this case, prepares a draft email, which ultimately turns into the email from Bill Hoft to Greg Owens, which says, in final form, we at Caterpillar noted Iron Planet's new relationship. We are concerned that Caterpillar and the cat dealers would have significant concerns about this arrangement. And so I think all of that suggests Is it enough if you have two competitors separately expressing concerns to Iron Planet and the competitors are aware that each other, that they're expressing those concerns? And I'll add competitors who are not in this case. Those two competitors are not at the other table. So two points in response to that. First, that is the very issue that, of course, we think should go to the jury. The question here, Judge Branch, as you are aware at summary judgment, is whether or not the evidence to which I pointed is sufficient for a jury to draw a reasonable inference that there, in fact, was coordination, that these were not defendants acting independently. And, of course, that is ultimately the fact question that would be for the jury to decide. Second, if you disagree with me, that that evidence is sufficient. At a minimum, we have sufficient evidence here for the tortious interference claims to go forward because, of course, those claims do not require an agreement. They simply require the defendants to be applying pressure. And on page three of its opinion, the district court itself conceded that the decision to was, quote, pressure by industry stakeholders. Thank you. You have three minutes for rebuttal. Great. Thank you, Judge Branch. And it looks like the appellees, three of you are going to be sharing some time. Mr. Heap, you're going to go first, and you have seven minutes. Okay. May it please the Court. I'm Jeremy Heap. I represent Thompson Tractor. I'm going to speak for seven minutes, and then we'll have Mr. Landon representing Ziegler address. I'll address the evidence as to Thompson. Mr. Landon will address the evidence as to Ziegler. And Mr. Jurado will address the evidence as to Ring. Your Honors, the district court granted summary judgment in this case after reviewing all of the evidence and applying the proper standards. The material facts here are not in dispute. It was predicted that when this deal happened, that there would be concerns amongst manufacturers and dealers. It was announced publicly that it actually did happen. The dealers and manufacturers heard about it. They did express concerns. Iron Planet did terminate ICP. There is a long line of cases, beginning with the Supreme Court case in 1919 in Colgate, going through Monsanto and all the way up through the American Contractor case of this circuit in 2021, that says that one cannot make a conspiracy out of unilateral conduct. What about the fact that the district court referred to the plaintiff's burden as showing unambiguous involvement and opposing counsel has argued that this is an elevated burden that was impermissible? The district court was addressing the distinction between direct evidence and circumstantial evidence, and the judge made the very correct statement that under Matsushita, you can't have evidence considered direct evidence that also supports pro-competitive independent conduct. It's actually a distinction that's well set up through an entire line of cases. Now, this court asked or Mr. Shanmugam said that the best case is this helicopter systems case. In that case, there was what Judge Schlesinger asked about. There was actually evidence of communications between the competitors. That's what's missing here, agreement. Oh, and also in that case, there was actually a written agreement because at that point, vertical price fixing was illegal, per se illegal under Dr. Miles. There was a written agreement. The court said, of course, that's enough to get to a jury. In the American Contractors case, there was everything that was just talked about here plus more. There were complaints, there were threats, there were communications back and forth, there was confirmation of the reason for the termination in that case was the complaining incumbent dealer was complaining about this disruptive new dealer coming in. And it does appear, you would agree, that Thompson put pressure on the dealer, right? No. On this record, what Thompson inquired about the relationship between Iron Planet and ICP and it got its response. There was evidence that its deal was in a holding pattern until it got its response. And in the American Contractor case, there's actually the same exact language. The orders in that case were in a holding pattern pending confirmation by the manufacturer that the other dealer was going to be terminated because it was disruptive. It's really the black letter law that runs all the way up through 2020. I'm not saying that if there was pressure, that that's enough. I mean, I think you would still need some plus factors. I don't see why it's not fair to say that Thompson made probably, if there was no agreement, it's probably true that it would have been harmful to its business to have these new products displayed next to its used products. That's the American Contractor case. Thompson was concerned, as were the other dealers and manufacturers, that lesser priced new Chinese equipment coming in, being sold for the first time in the United States on a new platform, would be counter to its business and in particular would undercut the pricing of the used equipment that it was listing on the same exact website. Perfectly pro-competitive explanation under Matsushita and in the evidence and uncontradicted. And as Your Honor pointed out, there is a difference with the Delaware case, which is that there are these two lengthy affidavits that didn't appear in the Delaware decision that explain the phone calls between my client Thompson and Ring Power. There are literally hundreds of pages of pictures, specs, pricing, none of it subject to cross-examination by the other side because they didn't want to know what those phone calls were about. On pages 12 to 16 of our brief, we outline on a minute-by-minute explanation exactly what phone calls were happening while the specific specs and pictures were being sent to the other side. That's pro-competitive. They're having a pro-competitive business transaction, which was typical, and of course leads to communications. Of course there are communications between dealers, between Caterpillar dealers and Caterpillar. That can't be used as a conspiracy, and the subject of these affidavits is the only evidence. That phone call, which everyone on both sides of the phone call testified had nothing to do with ICP, is the only evidence of any communication at all between any of the three defendants in this case. And that letter that Thompson asked for was entirely under the American contractor's case and all of this full line of cases entirely within Thompson's right. What about the tortious interference claim? You know, Mr. Shanmugam has addressed that. We don't have to show the concerted action. So how do you address the fact that opposing counsel's argument is that there was sufficient pressure to cause Iron Planet to sever relations with international construction products such that their tortious interference has been shown? So it is uncontested, as we've just discussed, that it was entirely within Thompson's business decision-making ability to decide. There were six pieces of equipment, whether to list them on Iron Planet or not. They could have listed them somewhere else. They could have listed them on Ritchie Brothers. They could have sold them in their own backyard. That's their decision. What they wanted to know was whether or not Iron Planet was going to be listing this competing new equipment, which would undervalue its sale. That's entirely under the whole line of cases and all of the state law that's been discussed, and it's also been discussed in the Eleventh Circuit, entirely privileged, pro-competitive business conduct. Thank you. Thank you. Mr. Landon, you'll have four minutes. Thank you, Your Honor. Please, the Court. Richard Landon on behalf of Ziegler, Inc. With four minutes, I'll try to be very brief. We believe that the record clearly supports the district court's conclusion that there are no facts that demonstrate any conduct, any conduct, by Ziegler that could support a conspiracy. The only allegation that is directed at Ziegler in this appeal is a March 18th email. Opposing counsel referred to what he called a flurry of telephone calls. There's no allegation that Ziegler was part of any telephone call in April. The email wasn't great, though, was it? What's that? The email wasn't great, though, was it? I'm not sure what you mean, but we can talk about the email. The email, on its face, is clearly a merger discussion from Bill Hoff, who was the president of Ziegler, but also the chairman of Cat Auction Services. The email was fully within the scope of Mr. Hoff's responsibilities as the chairman for Cat Auction Services. He was tasked by the corporation to negotiate terms that shareholders would find acceptable. The timing of the email is not suspicious at all. It is a direct response to an offer from Greg Owens that came on March 13th. Greg Owens sent Cat Auction Services, sent Bill Hoff an offer, the first offer in the merger negotiations, and Bill Hoff's response was an acknowledgment of that offer, and it expressly said, we need to discuss this internally. We'll get back to you in a few weeks. The email did discuss, mentioned that they were aware of the relationship with ICP and said that they had concerns, but the email was written, Mr. Hoff testified that it was drafted by the Cat Auction Services merger team. Ken Adams, the investment banker that drafted it, said that the we was referring to Cat Auction Services. Why shouldn't a jury be able to decide whether Mr. Hoff was speaking as a Ziegler representative or Cat Auctions? Because there's no evidence that actually suggests that Ziegler had any interest in that email, any independent interest. There's no evidence regarding Ziegler's own business anywhere in this case. There's no relationship between Ziegler and Iron Planet. Ziegler didn't do business with Iron Planet. It sold its equipment through Cat Auction Services. There's no evidence that Ziegler, as a minority shareholder in Cat Auction Services, had the ability to determine the outcome of the merger itself. It was all within Mr. Hoff's responsibilities as chairman of the board, and the case law suggests that you should look to whether the conduct in question was within the scope of the chairman's responsibilities or not. There's no evidence to the contrary. Matsushita says that you have to do more than raise a metaphysical question to put it to the jury, and letting the jury decide which hat he is wearing is based on nothing more than pure speculation. In terms of the substance of the email, I think it's important to point out that the district court did not exclude evidence related to merger negotiations. If you look at pages 10 through 12 of the order, excuse me, 9 through 12, Judge Weatherill did explicitly consider ICP's allegations about the merger negotiations. Those are the only allegations that they have lodged against Ziegler. He did not ignore those. He simply concluded that they did not establish parallel conduct. It is not similar to the alleged threats to boycott that ICP has relied on. There is no allegation that Ziegler had any discussion with anybody about boycotting sales of used equipment or discussed with any of the other defendants the idea of blocking a merger based on the relationship with ICP. Thank you. Thank you, Mr. Landon. Mr. Jurado, you have four minutes as well. May it please the Court, I'm Jerry Jurado and I represent Ring Power. There is no evidence or the evidence does not support that Ring Power unilaterally threatened to withhold consigning the used equipment with ICP. So speaking only for myself, I think the hardest question here is whether a jury could infer from the timing of Fowler's calls that he was threatening Iron Planet. To me, that's the hardest question. Correct. And if you talk about those calls with Iron Planet, there were calls on the second, the third, and the fourth between Frank Fowler and Greg Owens. One, the independent, there's independent evidence, there's reasons for these calls to occur. First, Frank Fowler and Mr. Owens talked regularly. Mr. Owens talks about Frank, Mr. Fowler would call him if there was any issue with selling a piece of equipment. Mr. Fowler worked in the industry for many years and was the head of the used sales. He spoke with Iron Planet regularly. Two, there is evidence to support that Ring Power was an investor in Iron Planet, 0.55% investor. Mr. Fowler was an investor, 0.09%, and Mr. Ring here was an investor. There were 74 investors in Iron Planet. They testified that they were interested in what was happening at the time. They want to know what is happening with their investment, and that testimony is in the record. Three, the internal email from the day before supports that Mr. Fowler was going to call Mr. Owens. There's an email from April 1st internally that says, I'm going to call Mr. Owens. I want to verify what's going on. So that's indeed what happened. We have the testimony of Mr. Owens and Mr. Fowler, both testified in this case, 26 depositions. Mr. Fowler said there was never a threat. But Mr. Owens, more importantly, Iron Planet, said that there was never a threat to withhold equipment. The other Iron Planet individual said there was never a threat to hold equipment. But don't we know from case law that we can't really credit those denials, right? I think the Supreme Court has been clear that denials of this sort of conduct are not enough in the face of other evidence, right? Well, in the face of the Supreme Court, and I believe it was Anderson Liberty Lobby, said that the other side can't just say that they speculate, that the denials aren't good enough, in light of the other evidence that's out there. They can't speculate that the jury won't disbelieve the denials, the denials of Iron Planet. Not just Mr. Fowler, the denials of Iron Planet. So here we have speculation that those calls, when they occurred, in light of the independent reasons for those calls, in light of the fact that there is denials that there is any withholding or any threats to withhold equipment. So on one side, you have denial that occurred. You have independent reasons for why you would have such calls. On the other side, you have speculation that those calls must have included a threat. What about the call that took place just a few hours before Owens pulled the ICP product from the site? That would be on the third, I believe, they pulled it from the site. The timing is not quite clear about who may have pulled it from the site. There's an email from ICP that he did earlier in the day, but I don't think that changes the fact that they were interested in knowing what's going on with ICP. What about if we look at the hearsay, though, doesn't that suggest – now I have different questions about whether that comes in, but doesn't that suggest the hearsay that there was a boycott or threat or pressure? It's not about hearsay evidence and what it is. There was two pieces of hearsay evidence from, I believe, there was the August 4th conversation that is between Jeff Jeter. Again, we think it's hearsay, but on the merits, between Jeff Jeter, which is an ICP president, and it was also between Tim, the head of ICP, I forget his name. Tim Frank. Tim Frank. Tim Frank, yes. And allegedly that two manufacturers applied pressure. Repower is not a manufacturer. There would be inference upon inference upon inference to say that Repower was the one that was a manufacturer. It's just not. It sells, it distributes CATS equipment. There also is the hearsay evidence from the 16th of April where there's another communication or call between these two folks, and the testimony is that, well, who's also applied pressure? And the statement was, well, you know who our investors are. Well, there are 74 investors, and that was on the 16th of April. So that's the testimony. Isn't Ring Power one of those 74? It is. It's one of the 74 investors. So why wouldn't that be evidence? I don't think it's not. It isn't. Evidence. But why wouldn't that be enough evidence? Because enough evidence for an agreement? Right, to suggest that that sort of agreement had taken place, that that pressure was going on because of investor concerns, one of whom was Ring Power. Well, what kind of agreement? Because they're using that evidence to say that there's a direct agreement was taking place, and you'd have to have inference upon inference to say that there was a direct agreement that takes place. In terms of looking at whether there was a threat and then whether the parties agreed is another thing. What are the communications between that? I'm far over, but may I continue? Yes, please. Thank you. What are the evidence of the parties agreed as well? Let's say you go to that next step. Let's say that you can't show that there is any threat. We believe the evidence that we talked about. But then if you can't show that, but you also have to show that there was an agreement. There is no direct agreement like the helicopter case. You have to use circumstantial evidence plus factors to get to that agreement. What is the evidence? We didn't speak to Ziegler ever. So Ring Power never had a conversation with Ziegler. Thompson. I think Mr. Heath explained quite well that the communication with Thompson was about a piece of machinery that Ring Power was looking to sell. That's a common occurrence, and it did not have to deal with ICP. There was no communication with Komatsu, no communication with any other dealers. There was a call with Caterpillar on the third. I'll address that. The call with Caterpillar on the third, there was one call. It wasn't a flurry of calls. There were two voicemails, two 20-second voicemails before, and then there was a call with Mr. Longbottom. Now, Ring Power is a dealer of CAT. You would expect independently that they would have calls with CAT. They discussed that they had calls regularly with CAT. And I'm going to ask you to complete your thought. You're way over time. I understand that. So my thought is that it would be expected, one, the independent reasons that they would have a call. Two, they testified that there wasn't any discussion regarding ICP. Three, this is a new development in the industry, and as Judge Weatherthorpe pointed out, you would expect to have these calls even more so because of the new entrant into the industry. And I need to sit down now, but thank you very much. All right. Well, thank you very much. Mr. Shamagam, you have three minutes left for rebuttal. Great. Thank you, Judge Grant. Let me start with what Judge Grant described as the hardest question for my friends on the other side, what to do with this flurry of phone calls. And let me start with what Judge Andrews said about the flurry of phone calls in his opinion for the Delaware District Court at page star 20. He said the probative value of the calls as circumstantial evidence as an agreement only increases when considered in context. The fact that Iron Planet abruptly removed ICP from its website the very next day reinforces the inference that the purpose of the phone calls among Ring Power, Thompson, and Caterpillar was to coordinate a pressure campaign against Iron Planet. And at star 19 on that basis, he concluded that ICP had met its burden of showing that the evidence tends to exclude the possibility that Caterpillar, Ring Planet, and Thompson acted independently in pressuring Iron Planet. And notwithstanding the back and forth about the significance of the phone calls with Thompson, I would submit that we haven't really heard a credible explanation today of the communications between Ring Power and others, the communications with Caterpillar and Iron Planet, other than a generic statement that there were routine conversations between those parties. But isn't the burden on your client to establish what the calls were about? Just because they were phone calls doesn't mean you can let a jury speculate on what it was. But it's also true, Judge Schlesinger, that the mere fact of denials that there was an agreement is not sufficient. And again, that the jury is entitled to draw reasonable inferences. That's what I'm asking. If you don't know the content of the telephone call, how can you let a jury speculate and come up with a reason? Judge Schlesinger, I would submit because circumstantial evidence can be sufficient. You don't have to have smoking gun evidence of coordination in order to surmount summary judgment. And I would note that Mr. Heap, my friend Mr. Heap, said at one point, well, there were no communications between competitors. But the key point here is that there were communications between the dealers and Caterpillar and Iron Planet who were part of the conspiracy as well. What if the telephone calls were about are we going to play golf on Saturday? Does that give enough for a jury to speculate that they were colluding? Well, I think it would be one thing if, in fact, there was evidence of the content of all of those communications. But leaving aside the sale of the single piece of used equipment, there was no explanation for the specific content of those calls. Even defendant's own witnesses said simply that they couldn't remember what those calls were about. Let's assume that I think you're right, that those calls are evidence of plus factors, at least for ring power. What's your best evidence of the boycott threat or the pressure, the actual push against this move? So, you know, I would say two things about it. First, that, you know, of course there is the evidence as to Thompson with regard to this. Right, but I'm saying just for ring power. Right. I would say that it was the communication, I think, with regard to the threat concerning the boycott. It wasn't anything that ring power did. It was things that the other conspirators did. And in particular, you know, I would point once again to the email that Bill Hope sent here. The email that you described as as an email that wasn't great. And I would note that if you think that that email wasn't great, I would point you to the draft email, which was even worse. And that was an email that was prepared not by Hope, but by Cat Auctions Investment Banker. And it was an email that, you know, basically said, quote, without more full understanding, I have a strong suspicion that such a relationship, namely between Iron Planet and ICP, would kill any hope of a transaction between Iron Planet and Cat Auction from Caterpillar's perspective. And while that email wasn't set, I think it is certainly evidence of agreement and the intent to convey a threat that if this ICP deal goes forward, the merger would be dead. Do you think ring power can stay in if ring power itself didn't make any threats or boycott moves? Well, the only question is whether ring power shared, in Monsanto's words, the conscious commitment to a common scheme designed to achieve an unlawful objective. At that point, all you need is some additional overt act in furtherance of the conspiracy by the co-conspirators. And I think there is ample evidence of that here. Now, and I see that my time is almost up. No, you've exceeded your time. My time is going up. I apologize. So I think with that, I will rest on the breeze. And the last thing I would just say is that with regard to tortious interference, we do think there was sufficient evidence of threats here. So even if the panel disagrees with us on the issue of agreement, those claims would be allowed to go forward. Thank you. Thank you. Thank you all. The court is in recess until tomorrow morning. And we have.